

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 24, 2026

**BY ECF**
The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Carlos Mercado*, S2 23 Cr. 578 (JGK)

Dear Judge Koeltl:

      The Government respectfully submits this letter in advance of the sentencing hearing scheduled for March 4, 2026 for defendant Carlos Mercado, and in response to the defendant's sentencing memorandum, dated February 19, 2026. (Dkt. 165 ("Def. Br.")). On October 21, 2025, Mercado pleaded guilty to one count of conspiracy to commit theft of a postal key and one count of conspiracy to commit mail theft. For a period of several months, Mercado served as an integral cog in a conspiracy that stole approximately tens of millions of dollars in checks, resulting in millions of dollars in actual losses to victims. Moreover, when he was caught, Mercado led police officers on an exceedingly dangerous car chase, ultimately causing another driver to be rushed to the hospital for medical treatment after Mercado crashed headfirst into the other driver. While he was initially released on bail conditions, Mercado's subsequent repeated violations of his conditions resulted in his being remanded to the Metropolitan Detention Center, where he has committed additional disciplinary infractions. For those reasons, as well as those forth below, the Court should impose a sentence within the Guidelines range of 46 to 57 months' imprisonment.

I.     **Background**

      **A.  Offense Conduct**

      Between at least in or about March 2023 and at least in or about July 2023, Mercado participated in a widespread scheme to unlawfully obtain U.S. Postal Service arrow keys and use those arrow keys to steal checks and other mail from USPS collection boxes, including in the Upper East Side in Manhattan.[1] (PSR ¶¶ 19-22). After the checks were stolen, Mercado's co-conspirators fraudulently altered those checks—for example, by altering the check amount or

---

[1] USPS collection boxes are lockable receptables into which individuals may deposit mail to be sent through the USPS, and from which postal carriers pick up such mail. (Presentence Investigation Report ("PSR") ¶ 17). Arrow keys, or postal keys, are distinctively shaped USPS keys that can be used to open multiple mail receptacles in a Zip code or mail route. (PSR ¶ 18).

payee information—before posting them for sale on social media or depositing them into bank accounts held in the name of third parties recruited by members of the conspiracy. (PSR ¶¶ 1926). Mercado's role was primarily to drive other co-conspirators to unlawfully obtain arrow keys or to steal mail, earning a few hundred dollars from his co-conspirators for each trip. (PSR ¶ 43). Mercado participated in the criminal scheme with knowledge of its participants, activities, scope, and structure. (PSR ¶ 43).

Mercado's participation in the criminal enterprise culminated in his arrest in the early morning hours on July 10, 2023, after Mercado and a co-conspirator ("CC-1") were caught red-handed stealing mail in the Upper East Side. Specifically, at approximately 2:25 a.m., NYPD officers in an unmarked police car observed CC-1 stealing mail from a collection box near Lexington Avenue and East 74th Street, while Mercado idled in a silver Hyundai Sonata next to the collection box. (PSR ¶ 35). The NYPD officers activated their emergency lights and boxed in the Sonata. (PSR ¶ 35). As CC-1 jumped back in their car, the NYPD officers exited their vehicle, announced themselves as police, drew their weapons, and ordered CC-1 and Mercado to exit the vehicle and show their hands. (PSR ¶ 36). CC-1 and Mercado did not comply. Instead, Mercado reversed the car and sped at one of the NYPD officers, narrowly missing him.[2] (PSR ¶ 36). Mercado then sped down Lexington Avenue toward East 73rd Street, turning the wrong way onto East 73rd Street and crashing head on with a black livery vehicle, whose driver needed to be taken to the hospital for medical treatment. (PSR ¶ 36). Mercado and CC-1 both fled from the car before they were apprehended by NYPD officers nearby. (PSR ¶ 36).

Following Mercado's and CC-1's arrests, NYPD officers recovered an arrow key from the collection box on Lexington Avenue and East 74th Street, as well as approximately 350 pieces of unprocessed mail from a bag in the car that Mercado and CC-1 used. (PSR ¶ 37). The mail that Mercado and CC-1 stole on July 10, 2023 contained at least approximately $176,286.87 in stolen checks. (PSR ¶ 39). In total, during Mercado's participation in the conspiracy,[3] the scheme caused at least approximately $7,230,337.11 in intended losses to victims in the form of stolen checks, at least $2,076,930.74 of which were deposited into bank accounts. (PSR ¶ 43).

**B. Charges, Plea, and Guidelines Range**

On July 10, 2023, Mercado was charged by criminal complaint with violations of 18 U.S.C. §§ 111 (attempted assault of an officer engaged in official duties), 371 (conspiracy to commit theft

---

[2] A brief excerpt from the bodycam footage of the incident is attached hereto as Exhibit A.

[3] Mercado is the first of six charged defendants to be sentenced. Defendant Michael Edwards pleaded guilty on November 13, 2025, and is scheduled to be sentenced by this Court on April 23, 2026. This Court dismissed the charges against defendant Shuron Malone on the Government's motion on February 18, 2026. The charges against defendants William Hill, Alixandria Lauture, and Shakeemo Hill remain pending before this Court and the Honorable Ronnie Abrams. The Government's investigation and evidence reflect that Edwards was the leader of the scheme and the most culpable, whereas Mercado was the least culpable of the charged defendants with respect to the illicit objects of the conspiracy. Of course, as discussed in greater detail below, Mercado's actions in fleeing from law enforcement are a serious aggravating factor.

of a postal key, theft of mail, and receipt of stolen mail), 1704 (theft of a postal key), and 1708 (theft of mail), arising from Mercado's conduct on July 10, 2023. (Dkt. 1). On November 6, 2023, a grand jury sitting in this District returned Indictment 23 Cr. 578, charging Mercado with violations of 18 U.S.C. §§ 371, 1704, and 1708, arising from the same conduct charged in the complaint. (Dkt. 30). On August 6, 2024, a grand jury sitting in this District returned Superseding Indictment S1 23 Cr. 578, which, in relevant part, charged Mercado with his participation in the broader conspiracy from early 2023 to July 2023, and substantive mail theft and postal key theft arising from his July 10, 2023 arrest. (Dkt. 58). On or about June 12, 2025, a grand jury sitting in this District returned Superseding Indictment S2 23 Cr. 578, which, in relevant part, charged Mercado with one count of conspiracy to commit theft of a postal key, one count of conspiracy to commit mail theft, and two substantive mail theft and postal key theft counts. (Dkt. 81).

On October 21, 2025, Mercado pleaded guilty pursuant to a plea agreement to the two conspiracy counts with which he was charged—that is, Counts Two and Three of the S2 Indictment. In the plea agreement, the parties stipulated to (i) a base offense level of 6 pursuant to U.S.S.G. § 2B1.1(a)(2) and § 2X1.1(a); (ii) an 18-level increase based on the loss amount attributable to the conspiracy during Mercado's participation (*i.e.*, $7,230,337.11) pursuant to U.S.S.G. § 2B1.1(b)(1)(J); (iii) a 2-level increase based on the number of victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A); (iv) a 2-level reduction based on Mercado's reduced role in the conspiracy, pursuant to U.S.S.G. § 3B1.2(b);[4] (v) a 2-level increase based on Mercado's reckless endangerment during flight, pursuant to U.S.S.G. § 3C1.2; and (vi) a 3-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. Based on an offense level of 23 and a Criminal History Category of I, the parties stipulated to an applicable Guidelines range of 46 to 57 months' imprisonment.

The Probation Department calculated the same offense level of 23 (*see* PSR ¶¶ 52-66), Criminal History Category of I (*see* PSR ¶¶ 67-70), and resulting Guidelines range of 46-57 months' imprisonment (*see* PSR ¶ 122). The Probation Department recommends a below-Guidelines sentence of 36 months' imprisonment. (PSR, at 30). The defendant seeks a sentence of 24 months' imprisonment. (Def. Br. at 3).

II.    **Applicable Law**

As the Court is well aware, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After making the initial Guidelines calculation, a sentencing judge must then consider the factors outlined in Title 18, United States Code, Section 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and sets forth seven specific considerations:

---

[4] The parties' plea agreement correctly applies a 2-level minor-role reduction under U.S.S.G. § 3B1.2(b), but erroneously references the minimal-role reduction under U.S.S.G. § 3B1.2(a). The PSR references the correct Guidelines provision. (*See* PSR ¶ 59).

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

While a district court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. To the extent a district court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50. The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

### III. Discussion

This Court should impose a sentence within the applicable Guidelines range of 46 to 57

months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to address the seriousness of the offense and to provide just punishment, the need to promote respect for the law, and the need to provide general and specific deterrence.

### A. The Seriousness of the Offense and Need to Provide Just Punishment

The defendant actively participated in and facilitated the acquisition of USPS arrow keys and the theft of mail from USPS collection boxes for more than four months—including a single incident on July 10, 2023 in which Mercado and a co-conspirator stole nearly $200,000 in checks from the mail before they were intercepted by law enforcement. Stealing mail—especially using a USPS postal key—is a serious offense. Far from being victimless, millions of Americans rely on the U.S. mail system and trust the USPS to send important items of monetary, professional, and personal value, whether they be rent checks, bill payments, passport applications, job applications, financial aid applications, tax filings, or even a card to a loved one. Indeed, in 2024 alone, approximately 112.5 billion pieces of mail were delivered by the USPS. United States Postal Service, "A Decade of Facts & Figures," *available at* https://facts.usps.com/table-facts/ (last visited Feb. 24, 2026).

Mercado's role as a driver for other co-conspirators—though less culpable than those who participated in the conspiracy for longer periods of time, who were directly involved in multiple aspects of the scheme, or who directly reaped financial benefits from the conspiracy—was nevertheless an integral part of the scheme. By its very nature, stealing mail from a physical collection box is not something that can be done remotely, and getaway drivers are often crucial to the success of the offense, as the participants would otherwise be far more likely to get stopped and caught. The seriousness of Mercado's conduct is underscored by the impact on its victims, which includes innocent victims whose checks were unlawfully obtained by Mercado and his co-conspirators, the financial institutions that were defrauded when those stolen checks were deposited, and the integrity of and public trust in a government agency that provides a crucial system to the public. Moreover, Mercado's use of a postal key—property belonging to the USPS that can unlock multiple USPS mailboxes—aggravates the seriousness of his conduct, as such mailboxes and mailbox locks must be replaced after the postal key falls into the wrong hands. At bottom, Mercado's conduct impaired the integrity and operations of a government agency that provides a crucial service to the public, and it is deserving of appropriate punishment to promote respect for the law.

To be sure, Mercado's role as a driver for other members of the conspiracy also directly endangered the physical safety of others in a way that his co-conspirators' conduct did not. Despite law enforcement's instructions to Mercado and CC-1 to surrender after being caught in the process of stealing mail, Mercado instead decided to flee from law enforcement, nearly hitting an NYPD officer with his vehicle before crashing head-on into another vehicle while driving the wrong way on a one-way street. Although the NYPD officer—who was on foot—was fortunate to avoid being hit, the livery driver—who needed to be taken to the hospital for medical treatment—was not so lucky. In sum, Mercado's flight from law enforcement is a substantial aggravating factor that reflects his consciousness of guilt, failure to comply with the law, and complete disregard for the safety of others.

## B. The Need to Promote Respect for the Law and General and Specific Deterrence

The need to deter Mercado and others from similar types of offenses also supports a substantial sentence. Based on statistics compiled by the U.S. Postal Inspection Service, mail theft increased significantly during the COVID-19 pandemic, with more than 27,000 mail theft complaints in fiscal years 2021 and 2022. *See generally* Office of the Inspector General, United States Postal Service, "U.S. Postal Service's Response to Mail Theft," *available at* https://www.uspsoig.gov/sites/default/files/reports/2023-10/22-178-r23.pdf (last visited Feb. 24, 2026). Of course, none of this is surprising: stealing mail can be a lucrative enterprise that does not require much financial overhead or technical skill. Indeed, Mercado and his co-conspirator stole nearly $200,000 in checks in just one night. In other words, this conduct that presents significant financial upside with low barriers to entry is precisely the kind of calculated conduct that can and should be generally deterred with a meaningful sentence. *Accord United States v. Zukerman*, 897 F.3d 423, 430 (2d Cir. 2018) (general deterrence considerations "argue for punishing more heavily those offenses that are either lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it").

Specific deterrence considerations are also consistent with a substantial sentence in this case. In particular, while Mercado's rehabilitative efforts are commendable and relevant to his risk of recidivism, they are tempered by certain of his post-arrest conduct in at least two meaningful respects. *First*, as the Court is aware, the defendant was remanded in August 2024 following two incidents of alleged criminal conduct: (i) in or about March 2024, three perpetrators (one of which was identified as Mercado by his U.S. Probation Officer) allegedly stole a credit card from a vehicle in Norwalk, Connecticut, which was subsequently used without authorization at various retail locations in Connecticut; and (ii) in or about April 2024, Mercado (who was identified by the victims) allegedly purchased a BMW vehicle for $30,000 using a fraudulent check, and subsequently led investigating law enforcement officers on a 90 mile-per-hour chase in Connecticut, as described in the PSR and in bail violation memoranda submitted to the Court by Pretrial Services, dated April 11, 2024, and June 4, 2024.[5] (*See* PSR ¶¶ 72-73). *Second*, even after the defendant's remand, he continued to violate the rules of the facility, incurring disciplinary sanctions for fighting with another person and refusing to obey correctional authorities in September 2025. (PSR ¶¶ 11-12). Ultimately, the defendant's pattern of non-compliance with conditions of release—particularly through dangerous conduct similar to that with which he was



charged—and violations of facility rules demonstrates a potential inability to abide by the law in the future.

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Guidelines range of 46 to 57 months' imprisonment.[6]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    /s/_____
Jerry J. Fang / William K. Stone
Assistant United States Attorneys
Southern District of New York
Tel. 212-637-2584 / -2521

cc: Matthew Kluger, Esq. (by ECF)

---

[6] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).